Richette, Appellant, *v.* Pennsylvania Railroad, Appellant.

8

Argued November 26, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

rear-gument refused February 26, 1963.

*James E. Beasley, Sheldon L. Albert,* with them *Beasley & Ornsteen,* for plaintiff.

*Joseph Neff Ewing, Jr.,* with him *Leonard D. Slutz, Ivar H. Peterson,* and *Saul, Ewing, Remick & Saul,* for defendant union.

*Robert M. Landis,* with him *Dechert, Price & Rhoads,* for defendant railroad.

OPINION BY MR. JUSTICE MUSMANNO, January 21, 1963:

The relationship between a lawyer and his client is a serious, vital and solemn one. No third person may interfere with that relationship any more than he may with propriety intervene between a doctor and

his patient. A claimant or patient may, of course, disengage himself from a professional relationship provided he has met all obligations owing to his legal or medical counsellor, but if that disassociation is the result of coercion or misrepresentation practiced by others, the intervenors are answerable in law as anyone else would be liable for causing the rupture of a binding contract.

In *Klauder v. Cregar*, 327 Pa. 1, Justice SCHAFFER, speaking for a unanimous court, said: ". . . it is opportune to remark that 'a contract confers certain rights on the person with whom it is made, and not only binds the parties to it by the obligation entered into, but also imposes on all the world the duty of respecting that contractual obligation . . . If one maliciously interferes in a contract between two parties, and induces one of them to break that contract to the injury of the other, the party injured can maintain an action against the wrongdoer': Caskie v. Phila. Rapid Transit Co., 321 Pa. 157, 159, 184 A. 17. An agreement between an attorney and a client on a contingent fee basis is a legal and valid contract and as such is entitled to the protection of the law: Williams v. Phila., 208 Pa. 282, 57 A. 578."

The plaintiff in this case, L. J. Richette, is an attorney in good standing at the Philadelphia Bar. E. W. Richardson, was an employee of the Pennsylvania Railroad, working as a station cleaner. On Aug. 13, 1957, he was injured in an accident involving the railroad company. On March 28, 1958, he engaged L. J. Richette as his attorney, signing a power of attorney to that effect. On April 3, 1958, Attorney Richette received a letter from Richardson, which stated that he was revoking his power of attorney to him. In due time, Mr. Richette concluded that Richardson had been coerced into signing the revocation of power of attorney by certain representatives of the Brotherhood of

Railway & Steamship Clerks, Freight Handlers, Express & Station Employees (hereafter called the Union or Brotherhood), and of the Pennsylvania Railroad. He brought a suit in trespass against the named individuals involved, as well as the Brotherhood and the Railroad, charging them with having illegally interfered with the contract outstanding between him and Richardson, and claiming compensatory damages in the sum of $10,000, plus punitive damages in the sum of $120,000.[1]

At the ensuing trial the jury returned a verdict in the plaintiff's favor in the sum of $10,000 compensatory damages and $15,000 punitive damages against all defendants. Various post-trial motions were filed. The court entered judgment n.o.v. as to punitive damages and ordered a new trial on the compensatory verdict.

The case is now before us with the plaintiff asking that the verdict of the jury, as originally rendered, be restored, and the defendants asking that the order for a new trial be reversed and judgment n.o.v. be entered on the compensatory verdict.

In view of the fact that the plaintiff is the verdict winner we must review the record with respect to judgment n.o.v., in the light most favorable to him. With that kind of light illuminating the printed pages, the following facts stand out practically in bold type. As already stated, Richardson was injured on August 13, 1957, the injury being a fractured ankle. He was treated at the Presbyterian Hospital in Philadelphia where he was visited by Robert E. Shultz, railroad claim agent, who informed him that it would be to his best interests to deal with the railroad company in settling his case. By February, 1958, Richardson's

---

[1] The original suit included as defendants also the name of E. W. Richardson, the injured client, and Allen S. Olmsted, attorney for the Pennsylvania Railroad. These names were later dropped from the suit.

railroad retirement benefits were exhausted and Mr. Shultz on March 6, 1958, advanced to him $250 to provide living necessities, the amount to be credited against his ultimate settlement with the railroad company.

In the latter part of March, 1958, Richardson called on Bernard Spencer, a "protective committeeman," or shop steward of the Brotherhood, to speak about his accident and hoped-for monetary remuneration. Spencer said that he would turn Richardson's case over to Samuel D. Solomon, another protective committeeman of the Union, who would call on him the following day. Solomon failed to make the call promised by Spencer, and Richardson accordingly engaged L. J. Richette to represent him as his attorney.

The evening after engaging Richette, Solomon called at Richardson's home and, after learning of the attorney relationship, said to Richardson: "You did the wrong thing." Richardson testified to the following conversation: "He said, 'Mr. Shultz won't let you have any more money.' I said: 'I will need some money to live on. I haven't got anything. I have a wife to support. There is nothing coming in.' He said: 'You can't have any time for that lawyer. You are going to be out of a job.' "

The next day Richardson went to see Shultz in his office. Solomon was there. Richardson testified that the following conversation occurred at that time and in that place: "Q. Will you tell us what went on in Mr. Shultz's office? A. Do you mean what was said in there? Q. Yes. A. I went in there. Mr. Shultz said, 'I heard you retained a lawyer.' I told him I did. He went into the other room and then came out and said, 'We can't do anything for you as long as you have got that lawyer.' I said, 'I need something now to live on because I have not got anything.' He said, 'Is the $250 gone?' I said, 'That is done and gone.' Q. What

else did Mr. Shultz tell you? A. He walked into this other room and then came out and said he could not let me have any more money until I got shed of this lawyer. Q. This is the second 'shed'? A. I asked him how would I go about getting shed of the lawyer. In other words, what steps would I take."

Richardson then explained that Shultz gave him a typed letter and told him to go outside the office. Solomon went along with him and instructed him to copy in his own handwriting the words on the typed letter. He did this and the letter was mailed by Solomon to Richette. The letter read as follows: "I am hereby revoking my power of attorney I signed with you as I have never wanted any attorney to represent me and my claim against the penn R-R. Elford W. Richardson."

The letter was introduced as an exhibit in the case and reveals the handwriting of a person obviously a comparative stranger to writing instruments. It is also patently clear that the language in the letter was one which could hardly come from Richardson, a person of extremely limited education.

Richardson testified further that while in Shultz's office he was asked many questions and then he was handed a paper to sign. "Q. When all of this typing was completed, did Mr. Shultz or Mr. Solomon sit down and read this to you? A. No, they did not read it to me. Q. Will you tell us what happened? A. He handed it to me and told me to read it. I told him I could not read all that stuff. Q. You are not educated enough to read that stuff. A. I am not educated enough to read all that stuff. . . . Q. Did you have any idea as to what it stated in that affidavit? A. No, I don't. I know I was getting shed of my lawyer on account of the pressure that was on me."

There can be no doubt that the above cited testimony, if believed, made out a prima facie case of un-

warranted interference in the business relationship between Richardson and his attorney. We have here a practically illiterate man, 58 years of age at the time, injured, unable to get around except on crutches, destitute, hoping to get funds which would assure him of food for himself and wife, being threatened that if he didn't discharge his attorney who could help him to get what he was entitled to for his injury, he would not only receive no immediate funds but he would lose his job, the only train in which he could ride on, over the bumpy tracks of an uncertain economic world.

All this unquestionably spelt out a case of coercion. Richardson's testimony was controverted, it is true, in places it was self-contradictory, but the jury passed on his credibility, it reconciled the inconsistencies in his testimony, and it concluded that the proved facts in the trial warranted a conclusion that he had been intimidated into breaking his contract with the plaintiff.

The jury was warranted in finding from the evidence presented that the named defendants coordinated, through wile, stratagem and deception to separate an attorney from his client. It could not be said, as a matter of the law, that the jury went astray when they concluded, as they must have, that Richardson did not voluntarily write a letter revoking his power of attorney to Richette. Logic, sequence of events, and palpable circumstances justify their conclusion that the railroad company representatives prepared a letter of revocation, that they employed a maneuver to have Richardson copy that letter outside the railroad company office, thinking that this would wipe away their participation in the affair; that they supplied Richardson with the paper on which he was to copy the letter of revocation; that Solomon, working with the railroad, supervised the copying, and supplied the envelope, in which he placed the letter, which he consigned to the

United States mails. The jury were warranted in concluding that all the named defendants were a part of this plan and participated fully in the enterprise which finally resulted in depriving a member of the Philadelphia bar from legal business properly his. With these facts in the case, the jury was justified in imposing punitive damages on the defendants to the end that they, as well as all other persons and entities, should become aware that it is contrary to law and fair dealings in the United States, to sledgehammer a wedge between a lawyer and his client when both are satisfied with each other and have not invited intermeddling and officious intervention.

It is evident from the results that the jury paid no heed, and laudably so, to the banal, commonplace animadversions passed generally on lawyers.[2] Judge ALESSANDRONI, who presided at the trial, excellently put these hackneyed, mirthless, pointless so-called witticisms to rest when he instructed the jury: "Everyone engaged in the legal profession is aware of a longstanding opinion that a layman has had of lawyers, generally. Frankly it is not a good one. Rightly or wrongly, the opinion of the average layman towards a lawyer, is one of suspicion except with respect to his own lawyer. Then when he has his own lawyer, or chosen his own legal representative, his relationship with his lawyer is very much like the relationship of patient and doctor. He has complete confidence and

---

[2] Justice STORY of the Supreme Court of the United States wrote: "Notwithstanding the sneers of ignorance, and the jibes of wit, no men are so constantly called upon in their practice to exemplify the duties of good faith, incorruptible virtue, and chivalric honor, as lawyers. To them is often entrusted the peace and repose, as well as the property, of whole families; and the slightest departure from professional secrecy, or professional integrity, might involve their clients in ruin." Story: Miscellaneous Writings, Wisdom of the Supreme Court, 263.

respect in him. You have got to get out of your mind any general impression you have, or strong impressions you may have about lawyers as a class or as a group."

The trial judge also held the scales of justice equally balanced when he discussed corporations and unions: "It is also general information that there are many people who have no time for corporations; who have no time for railroads, transportation companies, taxicab companies, or public utilities. They have the impression that they are oppressive groups because of their magnitude, and financial power, because they crush the little man. That is a lot of nonsense. If there is any one in the jury that have such ideas about the defendants in this case dealing in that category, he should get out of the jury at once.

"Now, there are some people who do not like unions. That is too bad. Unions serve a very fine purpose and a very important need in the hands of proper men. If there are any one of you members that have any prejudices against the union or the brotherhood in this case, he should get out of the jury because he is not fit to serve."

The evidence in the case justified the verdict which was rendered. Anyone has the right to advise a person in legal difficulties to change lawyers just as one concerned about a friend's health may recommend him to a doctor other than the one presently prescribing for him. Such advice, however, must not be accompanied with threats. The use of such threats, all accruing to the serious disadvantage of the persons involved, may well be interpreted as reflecting that kind of malice, vindictiveness and wanton disregard of the lawyer's or doctor's rights which would call for punitive damages.

The court en banc, passing upon the various post-trial motions, held that the defendants were not subject to punitive damages because it said one of them, Bernard Spencer, was not really part of the conspira-

torial enterprise charged by the plaintiff, and that, therefore under the rule announced in *McCarthy v. De Armit,* 99 Pa. 63, 72, none of the defendants was responsible in exemplary damages. This Court said in the *McCarthy* case: ". . . the jury should have been instructed, as respects exemplary damages beyond compensation for the injury done to the plaintiff, to assess them according to the acts of the most innocent of the defendants, and if any defendant was not liable for exemplary damages, none should be included in the verdict . . ."

The jury in the case at bar did find Bernard Spencer responsible with the other defendants for the damages suffered by the plaintiff, and included him as liable for both compensatory and exemplary damages. The court en banc said that "there was no evidence to substantiate that Spencer said or did anything that could remotely connect him with the revocation of plaintiff's power of attorney or that Spencer's acts were malicious, vindictive or committed with wanton disregard of plaintiff's rights. Therefore, the claim for punitive damages as to defendant Spencer must fall and with it falls the plaintiff's claim for punitive damages against the joint tortfeasors who are the other defendants in the case before us."

Although the court en banc excluded Spencer from the punitive damages, it did not reverse the verdict of the jury with regard to his involvement for compensatory damages. The jury found, and properly so, that Spencer was an active agent in the series of events which resulted in Richardson's revoking the power of attorney he had given to Richette. Whether that participation was of such a character as to charge Spencer with a wanton disregard of the plaintiff's rights was a question of fact for the jury. The jury found he did so wantonly disregard the plaintiff's rights. The phrase, "malice, vindictiveness and wanton disregard"

of another's rights as used in this type of a case does not necessarily mean a malignant scheming against another person. It encompasses that kind of conduct which is so wholly reckless of another's rights as to call for a monetary penalty.

The record shows that Spencer was the first link in the chain of circumstances which finally pulled Richardson out of Richette's law offices. Spencer testified that when Richardson came to him for advice and assistance he said he would refer the case to their "local chairman" Al Nowak, and he promised Richardson he would write to Nowak. Spencer testified he wrote a letter but did not date it or mail it. He explained he did not send the letter because "I felt that my fellow representative Samuel Solomon *and myself* could better take care of this man than our local chairman." (Emphasis supplied).

It will be recalled that it was Solomon who threatened Richardson with loss of his job and who colluded with Shultz to exert "pressure" on Richardson, and who had Richardson copy the letter which was prepared in Shultz's office discharging Richette, and it was he who mailed that letter. Spencer stated that he consulted with Solomon about the case, that Solomon reported to him after he had talked with Richardson, that he kept in "close touch or harmony" with Solomon, that he discussed "arrangements" with Solomon, that he advised Solomon to go see Shultz, that Solomon reported back to him, and that he knew that a lawyer for Richardson was involved.

It is difficult to see how the court en banc could withdraw Spencer's hand from the Solomon gauntlet which unquestionably wielded the weapon which cut Richardson away from Richette. Spencer worked with Solomon, consulted with him, kept in "close touch" and "harmony" with him. If Solomon was one blade of the scissors which cut up the Richette-Richardson

contract, the jury could and did find that Spencer was the other blade. It is to be noted also in this connection that Shultz, who closed the railroad purse strings to Richardson, admitted that he talked to Spencer about the case, after first denying he had done so.

Spencer's name is so intertwined in the whole story of this whole extraordinary happening that it is impossible to say as a matter of law that he should have been excluded from the jury's consideration. Spencer's attitude in court was something to give the jury pause. He spoke derogatorily of Richardson's visit to him, stating that "He came to me for ridicule rather than assistance." Such a statement could not possibly agree with the facts because it was quite clear that Richardson went to him because he needed money since he was unable to work on account of his fractured leg and it was with considerable effort that he dragged himself to the office of Spencer to ask about his case.

Spencer's attitude in court could well have convinced the jury that there was something less than sincerity in his conduct toward Richardson and, his conduct, through conduit of circumstances, with Richardson's lawyer Richette. When he was asked about the letter he wrote to Nowak but never mailed and as to when he dated it, he replied: "As near as I can answer that question, sir, was when I realized that Mr. Richette was going to make a case out of this case."

When he manifested some evasion in answering questions put to him on cross-examination, the trial judge said: "Do you think you gentlemen are far apart from each other now?" To this, Spencer replied: "I told the man before if I get anywhere excited, I scream. Right now, he has made me somewhat excited." Later, when he was asked if he was getting excited, he replied: "No, I am just plain mad."

The jury could believe that the heat generated by Spencer on the witness stand was a smokescreen con-

cealing the unanswered doubts about the undated, unsent Nowak letter, his antagonistic attitude toward Richardson, his consultations with Solomon, and his general evasiveness.

The lower court abused its discretion in finding that Spencer, as a matter of law, was not connected with the revocation of the plaintiff's power of attorney, and the order entering judgment n.o.v. as to punitive damages must be vacated.

The lower court held correctly that the plaintiff made out a proper claim for compensatory damages even though it granted a new trial on the grounds of alleged excessiveness of verdict and prejudicial remarks by the plaintiff.

The Pennsylvania Railroad and the Union, as appellants here, argue that the court erred in ordering a new trial and asks this Court to enter judgment n.o.v. on the compensatory verdict. They assert that the power of attorney given by Richardson to Richette was illegal in that it contained a clause of irrevocability. The court en banc held correctly that the irrevocable feature in the contract was void as being against public policy, (*Wahl v. Strous*, 344 Pa. 402), so that it should be unnecessary to discuss that phase of the case any further.

The brief submitted by the Pennsylvania Railroad vigorously assails the Richette-Richardson contract as being an "irrevocable, champertous contingent fee" agreement. This statement contains three adjectives, but they are not necessarily cohesive. In construing a contract, each and every part of it must be taken into consideration and given effect if possible. (*Ivey Co. v. Franklin Associates*, 370 Pa. 225). The court below having amputated away the "irrevocable" feature of this case, there is no point in constantly referring to the contract as irrevocable. This leaves "champertous" and "contingent fee" to consider. A champertous agree-

ment is one in which a person having otherwise no interest in the subject matter of an action undertakes to carry on the suit at his own expense in consideration of receiving a share of what is recovered. This, of course, is abstract language. An agreement can be regarded champertous only when it is demonstrated that it does what the law does not allow. The adjective "champertous", as here used in the brief adds nothing to solving the problem on appeal. It is simply ornamental, so that the only part of the accusatory statement which is left is that one which designates the Richette-Richardson agreement as a "contingent fee" agreement. Are contingent fees illegal in Pennsylvania?

Apparently the railroad company did not think so during the first four years of this litigation. It did not raise the question in the pleadings or at the trial. It said nothing about this feature of the case in the post-trial arguments. It wasn't until the case arrived here on appeal that the railroad company directed its attention to the contingent fee phase of the Richardson-Richette contract. However, even if the question had been raised earlier, the result would have been the same because contingent fees are no novelty in the practice of the law.

In the case of *Williams v. Philadelphia*, 208 Pa. 282, we find that in September, 1892, the Mayor and the City Solicitor of Philadelphia appointed the reputable attorney Carroll R. Williams, under an appropriate resolution enacted by the City Councils, to prosecute the claim of the city for credit on taxes paid by the city treasurer, the compensation of the attorney to be fixed at "ten per cent of the amount collected or recovered." The city later refused to pay Mr. Williams. He entered suit. This Court acknowledged that Williams "had therefore an interest in the contract apart from his mere employment as an attorney," and held

that this did not illegalize his contract. "It is urged [Chief Justice MITCHELL wrote] and that is perhaps the main stress of the argument here, that the contract is champertous and should not be enforced by the courts. But the facts do not sustain this view. Contingent fees are not illegal. They enable some just claims to be recovered which the circumstances of the parties would otherwise defeat, while on the other hand they certainly tend to encourage litigation of a speculative and unfounded character, which is against the true interests of society. But, wisely or unwisely, a point on which opinions may fairly differ, the law has long been settled that contracts for such fees are lawful and enforceable by the courts and *something more than the mere contingency of the compensation is necessary to make them champertous.*" (Emphasis supplied).

Still the railroad company argues that contingent fees are illegal. It devotes some 20 pages to attacking contingent fees. Without contingent fees in the practice of the law, considerable portions of the courthouses throughout the land, innumerable law offices and other parts of the legal machinery of the nation would be mantled with cobwebs. In addition, the concept of justice itself would be dealt a staggering blow. Our present Chief Justice JOHN C. BELL has said: "However, I regard the contingent fee as a necessity for a poor man. A poor man is entitled to representation by a lawyer of his choice, whom he considers able or very able. In many civil and criminal cases a poor person is unable to engage such a lawyer except on the basis of a contingent fee. Provided such a fee is fair and reasonable (taking into consideration all the factors which are or should be taken into consideration in the particular case), I believe that realistically it is both proper and necessary." (Concurring opinion in *Peyton v. Margiotti,* 398 Pa. 86, 95).

If it were not for contingent fees, indigent victims of tortious accidents would be subject to the unbridled, self-willed partisanship of their tortfeasors. The person who has, without fault on his part, been injured and who, because of his injury, is unable to work, and has a large family to support, and has no money to engage a lawyer, would be at the mercy of the person who disabled him because, being in a superior economic position, the injuring person could force on his victim, desperately in need of money to keep the candle of life burning in himself and his dependent ones, a wholly unconscionable meager sum in settlement, or even refuse to pay him anything at all. Any society, and especially a democratic one, worthy of respect in the spectrum of civilization, should never tolerate such a victimization of the weak by the mighty.

Of course, an excessive contingent fee could not be enforced in law just as an excessive fixed fee might be unenforcible if it took inequitable advantage of the payer or in any way offended against public policy.

Contingent fees are not limited to personal injury cases. Even in contract, equity, criminal and other legal actions, fees are often graduated according to the success to be achieved by the lawyer. Such an agreement, when voluntarily entered into, not only does not offend against the law and morals but it often provides an incentive which might make for better work on the part of the lawyer. A fee which is not absolutely fixed at the initiation of the relationship between the lawyer and his client is bound to be in the nature of a contingent fee, and it is absurd to say that a lawyer and his client cannot enter into a fair arrangement whereby the lawyer is paid a little more for winning a case than for losing it.

The Richette-Richardson agreement provided that the attorney would receive 33 1/3% of whatever amount was recovered by the lawyer for his client. While such

a percentage is a rather generous portion of whatever is obtained by verdict or settlement, the law has not indicated in any way that such a percentage is excessive.

The railroad company argues that the Richette power of attorney offends against Section 542 of the Restatement, Contracts, which provides that "a bargain to endeavor to enforce a claim in consideration of a promise of a share of the proceeds . . . is illegal, if it is also part of the bargain that (a) the party seeking to enforce the claim shall pay the expenses incident thereto."

The difficulty with the railroad's argument in this respect is that it has apparently misread the power of attorney in controversy. Here it is verbatim:

"3/28 1958

"I/we, the undersigned, do appoint L. J. Richette of the firm of MEEHAN, O'BRIEN & RICHETTE, to institute and maintain an action against Pa. R.R. to recover damages for personal injuries and/or property damages sustained by me/us on the 13 day of Aug. 1957 or to effect an amicable settlement.

"And I/we agree that out of whatever sum is secured either by my/our said attorney or by me/us from the above defendant, either by way of settlement or verdict, the said attorney for and in consideration of the professional services to be rendered by him in the investigation, institution, and general conduct of the said case shall retain or be entitled to 1/3 of the amount to be received; all expenses incident to investigation, institution and trial of the case to be paid by said attorney; however this power of attorney shall be irrevocable upon the expenditure of time or money by counsel.

"Should no money be recovered by suit or settlement, said attorney to have no claim against me/us

of any kind for services rendered. I/we hereby acknowledge receipt of a duplicate copy hereof.

E. W. Richardson       (Seal)"

It will be noted that the pertinent portions of the contract read: "I agree that *out of whatever sum is secured* . . . the said attorney . . . shall retain . . . all expenses incident to investigation, institution and trial of the case . . ."

Thus, the expenses of litigation are being deducted from the recovery sum and are not being paid by the attorney, except in anticipation. Even Section 542 permits that kind of an agreement. Illustration 2 of that section reads: "A, an attorney-at-law, undertakes to prosecute a claim of B, a poor person who has been hurt in an accident. B promises that A shall have one-quarter of the recovery as his fee. A does not agree to pay the expenses of enforcing the claim but knows that he will have to advance the money needed, since B is without funds. The bargain is not illegal, and A may retain from the amount recovered the agreed fee and also the expenses of enforcement of his claim."

There is no practical difference between agreeing to pay the expenses and *knowing* that he (the attorney) *will have to advance the money needed.*

The lower court held that the amount of the compensatory verdict of $10,000 was "excessive and perverse." The trial judge charged the jury, with regard to damages: "The plaintiff, in his own testimony from the witness stand, claimed a fee of $10,000 in this case upon the assumption that this case could have been settled or he could have obtained a verdict at the hands of a jury in the sum of $30,000. What the plaintiff defined as the value of the case, is a matter for you to consider. It is not binding upon you any more than that figure that Judge OLIVER submitted."

Former Judge L. S. OLIVER, who had had considerable trial experience, testified that a fair settlement

value of Richardson's case would range between $7500 and $8500.[3] However, it is to be noted that Judge OLIVER's estimate referred only to the settlement value of the case, and it is incontrovertible that litigants invariably are willing to take less in settlement than what they believe they have the right to expect in a verdict. Mr. Richette testified to the jury verdict value of the case. It is not evident how $10,000, which would be the sum Richette would receive under his contract, considering a $30,000 verdict, would be excessive.[4]

The lower court says that the verdict was "perverse" but does not precisely show wherein it was perverse. It points out that Richardson "repeatedly admitted that he lied in his deposition of June 1958 as he was trying to hold a job with the Railroad Company." Whatever his testimony was, it was submitted to the jury under correct instructions by the trial judge and the jury passed upon Richardson's statements made in his deposition as well as what he testified to in court. The court's utterance that the verdict cannot stand because of Richardson's testimony is without merit. The jury found that Richardson told his story as best he could. The law does not require that testimony be like a cut diamond, mathematically perfect, its facets polished, and so accurately ground that the light shines upon it from all sides, producing a flawless radiance. Witnesses are not always polished and their various facets are not always intellectually radiant. A witness must be taken as he is. If, from all he says, the jury is convinced that he is essentially honest and, from all his testimony, there emerges a

---

[3] The case was actually settled for $8500.

[4] The plaintiff's injury was a serious one. Considering his lack of education and a permanent trade, it could well disable him for the rest of his life in the fiercely competitive field for unskilled labor.

story that is acceptable as reflecting truth, the witness must not be discarded because he tripped on a comma or stammered over a semicolon.

The defendants maintain they are entitled to a new trial because of alleged prejudicial remarks made by the plaintiff when he was on the witness stand. The trial was hotly contested on both sides. It was inevitable that the plaintiff would endeavor, while testifying, to further his case to the utmost just as the defendants' lawyers sought in their cross-examination to derogate his claims and disparage his assertions. Many spirited passage-at-arms were exchanged between the witness stand and the cross-examining table. But a new trial may not be ordered merely because of abrasive answers which are made to questions which seek to demolish the reliability and credibility of the witness. For instance, in attempting to establish that the plaintiff did not do very much for Richardson, the injured client, the cross-examining attorney asked the plaintiff-lawyer: "In the preparation of this, during that period of time, you did not investigate . . ."

The plaintiff replied: "I could not. You took it away from me so fast that I could not do anything with this case at all." Railroad counsel turned to the court: "If your Honor please, may I ask that you instruct the witness to answer the questions and not to resort to gratuitous remarks." The court ruled: "That is a good suggestion but I don't think I have the power to shut him up." The railroad attorney then asked the plaintiff: "Did you take any photographs of Mr. Richardson's injury?" And the plaintiff replied: "Your Honor, I answered him. I did not have this case in my office long enough to do anything."

While the witness's answers were sharp, they were in direct reply to the queries put to him, and it cannot be said that they were of a character which vitiated the fairness of the trial.

Although railroad counsel did not ask for the withdrawal of a juror in the colloquy just related, he did so move the court on other occasions. In each instance the trial judge refused the motion, and it is not apparent that he abused his discretion in doing so.

Some of the answers with which the defendants find fault were, in a measure, provoked by the nature of the questions. At one stage of the trial, railroad counsel asked the plaintiff: "Didn't Mr. Zawada, after a day or two after Mr. Richardson came to you on March 28th, call you and ask whether Mr. Richardson came to you?"

The cross-examiner here invited the witness to relate the conversation between him and Mr. Zawada, and the witness did so relate: "Mr. Zawada did discuss Mr. Richardson's coming with me. Naturally, I asked him about it—who in this Union and who in this Railroad would attempt to steal this man from me?"

The answer here was damaging to the cross-examiner's side of the case, but it cannot be said that it was improper. The cross-examiner asked the witness the nature of the conversation he had had with Zawada, and the witness told him. The cross-examiner took a risk in putting such a question, and he may not complain because the answer was one he did not like, but one which, considering all the other testimony in the case, he might conceivably have seen was forthcoming.

On another occasion the cross-examiner and the witness battled as follows: "Q. Yesterday, Mr. Richette, you testified at some length about putting a power of attorney in front of Mr. Richardson, on the desk in your office, and leaving it there for him. Do you recall that testimony? A. Oh, yes. Q. The simple fact is, as you explained it, that you did not give it to him? A. He did not pick it up is the answer, Mr. Landis. Q. You did not give it to him because, as you say, you very rarely give powers of attorney to clients?

A. That is true. I very rarely handle them physically and say, 'Put this in your pocket.' I have never had a case stolen from me. I never had this problem before, Mr. Landis."

Here again the cross-examiner opened a dangerous door for his case. He asked *why* the plaintiff did not give a power of attorney to Richardson, and the witness explained why. Again the cross-examiner took a calculated risk. Even so, in spite of the adverse answer, railroad counsel did not ask for the withdrawal of a juror. He only asked that the "latter part" of the answer be stricken. The court then said: "That statement could bring a motion for the withdrawal of a juror."

Thereupon, railroad counsel moved for the withdrawal of a juror which motion was refused. The plaintiff then apologized. This took place in the very early part of the trial, and it cannot be said, in view of the plaintiff's apology, and the admonition administered by the trial judge at the time, that he abused his discretion in refusing to withdraw a juror.

The reasons given by the court below for a new trial are not justified by the record. However, we do believe that, in an overall appraisal of the case, the amount of the verdict for punitive damages was excessive and this would justify a new trial for the ascertainment of the correct sum. But to order a new trial would in itself work a hardship on all parties concerned. A great deal of work went into the preparation of this case; the trial itself lasted eleven days. It would be supererogatory to go through another long trial when the record demonstrates that the issues were properly presented and, with one exception, properly decided by the jury. The parties have had their day in court. The attorneys were able practitioners, the presiding judge was a veteran of the bench and bar, his charge could be a model for clarity, impartiality,

and decisiveness. Good judgment dictates against an unnecessary repetition of all this excellent work. Good judgment also dictates that, considering the clogged conditions of the trial calendars, new trials should not be required unless the interests of justice imperatively require them.

The Legislature has provided a manner for disposing of an extraordinary situation such as the one presented in this case. It declared, by the Act of May 20, 1891, P. L. 101, §2, 12 P.S. §1164 that: "The supreme court shall have power in all cases to affirm, reverse, amend or modify a judgment .... appealed from, and to enter such judgment, order or decree in the case as the supreme court may deem proper and just." In *Fries v. Ritter*, 381 Pa. 470, 476, we said: "This Court has the power under Section 2 of the Act of May 20, 1891, P. L. 101, 12 P.S. §1164, to reverse or open or vacate a judgment and 'to make such order as it deems proper and just': Downes v. Hodin, 377 Pa. 208, 104 A. 2d 495; Falk & Co. v. South Texas Cotton Oil Co., 368 Pa. 199, 82 A. 2d 27."

This Court concludes that it will be proper and just to reduce the amount of the verdict for punitive damages in this case from $15,000 to $5,000, while sustaining the verdict of $10,000 for compensatory damages.

This Court, therefore, orders that the judgment n.o.v. entered by the court below be reversed, the order for a new trial be reversed, and that the verdict of the jury shall be reinstated to the extent of the total sum of $15,000, and that judgment be entered in that amount.

———

DISSENTING AND CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

I would affirm the Order of the lower Court which granted defendants' motion for judgment n.o.v. on the

plaintiff's claim for punitive damages. I would also affirm the Court's action in granting a new trial of the plaintiff's claim for compensatory damages.

Richardson was injured. Thereafter he signed a contract employing Richette as his attorney to represent him in his claim for damages. Under the terms of this contract Richette was to receive a fee of one-third of the amount Richardson recovered, out of which third Richette was to be repaid such expenses as he had advanced. Richardson wrongfully discharged Richette as his attorney and settled directly his claim for the injuries he had suffered. Richardson received in settlement $8,500. On the basis of such settlement, Richette would have been entitled to one-third, less the amount of his expenses. A majority of this Court has now decided to award Richette, inter alia, compensatory damages in the sum of $10,000, on the theory that a jury would have awarded Richardson a verdict of *more than $30,000*. On the face of it, an award to Richette in compensatory damages alone of more than Richardson received would appear unjust.

The injustice of such an award by this Court is made even clearer by the opinion of the lower court which pertinently said: "The verdict of the jury in awarding compensatory damages in the sum of $10,000 was excessive and perverse. . . . In addition to the excessiveness of the verdict a new trial must be granted because of the numerous prejudicial remarks of the plaintiff on the witness stand . . . . In addition to the foregoing a new trial should be granted because plaintiff's witness, Richardson, repeatedly admitted that he lied in his deposition of June 1958 as he was trying to hold a job with the Railroad Company. A verdict based upon such testimony cannot stand."

I have not recited the evidence of the defendants which contradicts and refutes much of the plaintiff's claim. It will suffice to say that the evidence in this

case is so widely and highly conflicting and the amount which Richardson could likely have recovered if his case had been tried, is so *conjectural,* that I am convinced it is impossible for this Court to fairly and justly fix the dollar amount of compensatory damages.

For these reasons I would affirm the order of the lower court granting a new trial in respect to compensatory damages.