822 F.2d 1294
 Louis J. ORLANDO, Jr., individually and t/a Time, Date and Number Co.
v.
BILLCON INTERNATIONAL, INC. and Automated Business Products,
Inc. and Currency Counting Consultants, Inc. (Wayne,
Pennsylvania) and Ronald Brunner c/o Currency Counting
Consultants and Currency Counting Consultants, Inc.
(Montebello, California) and Paul Brunner c/o Currency
Counting Consultants, Inc.
Appeal of BILLCON INTERNATIONAL, INC., Ronald Brunner,
Currency Counting Consultants, Inc., (Wayne,
Pennsylvania), Currency Counting
Consultants, Inc.,
(Montebello,
California),
and Paul Brunner.
Appeal of Louis J. ORLANDO, Jr. t/a Time, Date and Number Co.
 Nos. 86-1666, 86-1674.
 United States Court of Appeals,
Third Circuit.
 Argued May 15, 1987.
Decided June 29, 1987.
Rehearing and Rehearing En Banc Denied Aug. 10, 1987.
 
 Frank J. Marcone, Media, Pa., for Billcon Intern., Inc., Currency Counting Consultants, Inc. (Pennsylvania and California), Ronald Brunner and Paul Brunner.
 Bruce L. Birchard, Birchard & Birchard, Los Angeles, Cal., for Billcon Intern., Inc.
 H. Donald Busch, Karen A. von Dreusche (argued), Busch, Grafman, von Dreusche & Carey, Bala Cynwyd, Pa., for Louis J. Orlando, Jr.
 Before GIBBONS, Chief Judge, MANSMANN, Circuit Judge and McCUNE, District Judge*.
 OPINION OF THE COURT
 GIBBONS, Chief Judge:
 
 
 1
 This appeal grows out of a suit by Louis J. Orlando, Jr. against Billcon International, Inc. (Billcon), Automated Business Products, Inc., Currency Counting Consultants, Inc. (Wayne, Pa.), Ronald Brunner, Currency Counting Consultants, Inc. (Montebello, Ca.), and Paul Brunner, alleging violations of section 1 et seq. of the Sherman Act, 15 U.S.C. Sec. 1 et seq. (1982), and common law causes of action for breach of contract and interference with present and prospective contractual and business relations. The district court granted a directed verdict in favor of Currency Counting Consultants, Inc. (Wayne, Pa.) and Ronald Brunner. The remaining claims were submitted to the jury which rendered a special verdict on interrogatories. The jury found that none of the defendants had violated section 1 of the Sherman Act. On the common law claims, it found: a) that Billcon had breached its contract with Orlando, awarding him $175,000 in compensatory damages; b) that Billcon interfered with Orlando's prospective economic and business relations, awarding him $82,000 in compensatory damages; c) that Orlando is entitled to punitive damages from Billcon on the interference claim, awarding him $125,000 in punitive damages. After a judgment was entered on the special verdict, Billcon moved for a judgment notwithstanding the verdict and for a new trial. The district court granted the judgment notwithstanding the verdict on the jury's award of compensatory and punitive damages on the interference claim, but denied both motions on the breach of contract claim. Billcon appeals from the $175,000 judgment for breach of contract. Orlando appeals from the grant of the judgment notwithstanding the verdict on the interference claims for compensatory and punitive damages. We will affirm the judgment on the breach of contract claim and reverse the judgment notwithstanding the verdict on the interference claims.
 
 I.
 
 2
 Billcon, a California corporation, is in the business of distributing coin and currency counting equipment. Orlando began distributing Billcon currency counting equipment in the greater Philadelphia area in 1978. Although Orlando's initial agreement with Billcon was oral, the parties entered into a written dealer sales contract on April 15, 1980. This agreement provided that Orlando would use reasonable efforts to sell Billcon products in an area based in Philadelphia, including all territory within a 100 mile radius, and that Orlando would purchase Billcon products according to an attached schedule. The schedule called for purchases of $15,000 per month. The agreement also provided that failure to purchase in accordance with the schedule would be a material breach. Paragraph 10 provided:
 
 
 3
 If either party hereto shall breach any material provision hereof, the other party hereto shall give the breaching party written notice of such breach and such breaching party shall have 30 days following the date of the sending of such notice to remedy such breach. If such breach is not remedied in such 30-day period, the Agreement shall automatically terminate following the expiration of such 30-day period.
 
 
 4
 The agreement was to be in effect until January 31, 1981. But paragraph 16 provided that "the parties hereto agree to negotiate in good faith for an extension hereof on corresponding terms and conditions."
 
 
 5
 There is evidence that Billcon determined in November, 1980 that Orlando would be terminated as a dealer. Although Orlando's purchases were running at $8000 a month rather than $15,000, no notice was given pursuant to paragraph 10. No negotiations for an extension pursuant to paragraph 16 occurred. On November 5, 1980, prior to the January 31, 1981 expiration date, Billcon's president wrote to Orlando that Billcon would arrange after May of 1981 to take Orlando to Japan to visit the factory where the machines were made. The letter asked for long-range sales forecasts. It included the observation that "I know that you are going to totally dominate our competition in the money processing field in the coming months and years ahead." Billcon continued, after January 31, 1981, to fill orders from Orlando. On May 6, 1981 Billcon's national sales manager wrote to Orlando:
 
 
 6
 I know that we keep telling you that we are coming out to see you, but this time I really mean it. Hopefully, this month as I have a new contract for you and Lou to sign, and I would like to see your operation.
 
 
 7
 Between January 31, 1981 and August 4, 1981 Billcon continued to treat Orlando as if he was a dealer, filling his orders and reassuring him that a new contract would be forthcoming. On August 4, 1981, however, with no prior notice, Billcon wrote to Orlando:
 
 
 8
 This letter is to inform you that due to unacceptable levels of your Company's sales of BILLCON products during your last contract period, BILLCON INTERNATIONAL, INC. does not intend to enter into a new contract of any kind for 1981 with TIME, DATE AND NUMBER.
 
 
 9
 Our basic policy is to accept orders only from sales organizations with which we have contracts. As a result of our not renewing any relationships with your Company, your order received by us July 31, 1981 is not being accepted.
 
 
 10
 There is evidence from which the jury could find that the reason asserted by Billcon in its August 4, 1981 letter for not extending Orlando's dealership contract was not true. After the termination letter, Ronald Brunner opened an office in Orlando's territory under the name Currency Counting Consultants, Inc. of Pennsylvania. Ronald Brunner did not have a dealership contract, but obtained Billcon equipment from his brother, Paul Brunner, president of Currency Counting Consultants, Inc. of California, which had such a contract. The jury could find that the reason for Orlando's termination was that Billcon decided to give his territory to the Brunners.
 
 
 11
 Under the terms of their dealer contracts, the Brunners were free to sell both in territories other than their own designated geographic areas, and to other resellers. Orlando attempted, after receiving the August 4, 1981 termination letter, to continue his business by purchasing Billcon equipment from other dealers. In response, Billcon's national sales manager requested that both Ronald Brunner and Automated Business Products, Inc. obtain the serial numbers of the equipment sold by Orlando so that Billcon could trace Orlando's source of supply. Billcon thereafter threatened the dealers supplying equipment to Orlando with cancellation. Moreover, on November 30, 1981 Billcon's sales manager took steps to have its legal counsel write to Reuben H. Donnelly Co., the publisher of the Philadelphia Area Yellow Pages, to demand that it decline Orlando's listing offering Billcon products for sale. On December 5, 1981, Billcon's counsel sent a letter to Reuben H. Donnelly Co. making this demand. About a week later Billcon wrote to Reuben H. Donnelly Co. authorizing it to accept a listing from Currency Counting Consultants, Inc. of Pennsylvania as the "authorized sales outlet for BILLCON products in the Greater Philadelphia area." When this letter was sent, Ronald Brunner's company had no dealership contract with Billcon and was, like Orlando, acquiring equipment through another dealer.
 
 
 12
 As a result of Billcon's efforts, the jury could find that both the supply and the sales end of Orlando's business were adversely affected. Late in 1982 Orlando acquired the distributorship of a Japanese manufactured currency counter, and restored his business to profitability.
 
 
 13
 At trial Billcon did not dispute that the decision to terminate Orlando as a dealer was made in November of 1980, that no notice was given pursuant to paragraph 10, and that no negotiations for an extension pursuant to paragraph 16 took place. Instead it urged that Orlando's failure to purchase $15,000 in equipment each month authorized the termination, that the language of paragraph 16 was only precatory, and that the post-January 31, 1981 relationship was terminable at will.
 
 
 14
 The jury found that there was a breach of contract and that there was a tortious interference with Orlando's business.
 
 II.
 
 15
 Orlando contends on appeal that the trial court erred in granting Billcon's motion for judgment notwithstanding the verdict. Fed.R.Civ.P. 50(b) permits consideration of such a motion only when a motion for a directed verdict has been made at the close of the evidence offered by an opponent. Fed.R.Civ.P. 50(a) requires that "[a] motion for a directed verdict shall state the specific grounds therefor." The Rule 50(b) motion may consider only specific grounds asserted in the motion for a directed verdict. Bonjorno v. Kaiser Aluminum & Chemical Corp., 752 F.2d 802, 814 (3d Cir.1984), cert. denied --- U.S. ----, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986).
 
 
 16
 At the end of Orlando's case-in-chief Billcon moved for a directed verdict on this ground:
 
 
 17
 8. There is no substantial evidence that Defendant BILLCON, without cause or justification, has unlawfully interfered with Plaintiff's contracts and business relationships with its customers, as alleged by Plaintiff.
 
 
 18
 At the end of the entire case the motion was arguably renewed orally, when Billcon urged that Orlando has not "advanced this case anywhere at all toward their assertions of a conspiracy and all the assertions in their complaint." Neither at the end of Orlando's case nor at the end of the entire case did Billcon make any reference to the sufficiency of the evidence on the tortious interference claim respecting compensatory or punitive damages.
 
 
 19
 In granting the judgment notwithstanding the verdict motion on the tortious interference claim, the district court ruled that "Plaintiff did not offer any evidence of profits he could have earned had Billcon not interfered with his operations after termination." However, Orlando was never put on notice that adequacy of proof of damages on the tortious interference claim was being disputed. Indeed, the tortious interference claim was submitted to the jury on an instruction, to which Billcon made no objection:
 
 
 20
 If you find that the plaintiff is entitled to damages on this claim, he is entitled to damages which would fairly and adequately compensate him for the pecuniary loss of the benefits of any contractual relationship which he suffered; all other pecuniary losses suffered by him as a result of any other wrongful acts you find, and then any emotional distress or harm to his reputation as a result of any wrongful acts of defendants as you find defined previously in these instructions.
 
 
 21
 Thus Orlando was justified in assuming that Billcon and the trial court were satisfied that there was sufficient proof of damages to permit this claim to go to the jury:
 
 
 22
 The requirement that the specific issue be raised first in the motion for a directed verdict, before the issue is submitted to the jury, affords the non-moving party an opportunity to reopen its case and present additional evidence. Further, when a trial court decides an issue after it was properly submitted to the jury, it may deprive the non-moving party of his seventh amendment rights.
 
 
 23
 Bonjorno v. Kaiser Aluminum & Chemical Corp., 752 F.2d at 814 (citations omitted). Thus the ground on which the district court acted in setting aside the jury verdict awarding compensatory and punitive damages on the tortious interference claim cannot be sustained.
 
 
 24
 Our ruling with respect to damages disposes, as well, of the district court's ruling that Billcon's failure to prove actual damages meant that punitive damages could not be awarded. The jury's award of $82,000 in actual damages supports its award of punitive damages. Sprague, Levinson & Thrall v. Advest, Inc., 623 F.Supp. 11 (E.D.Pa.) aff'd, 780 F.2d 1016 (3d Cir.1985).
 
 
 25
 Billcon urges that even if it did not preserve its objection to the sufficiency of proof of damages, the judgment notwithstanding the verdict on the tortious interference claim should nevertheless be affirmed because Orlando's evidence did not establish the elements of that tort as established by Pennsylvania law.
 
 
 26
 In Pennsylvania, the four elements of a cause of action for intentional interference with prospective contractual relations are: (1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct. Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 208, 412 A.2d 466, 471 (1979).
 
 
 27
 The Pennsylvania courts have referred to a "prospective contractual relation" as "something less than a contractual right, something more than a mere hope." Thompson, 488 Pa. at 209, 412 A.2d at 471. In Glenn v. Point Park College, 441 Pa. 474, 480-81, 272 A.2d 895, 898-99 (1971), the Pennsylvania Supreme Court provided a definition of this term:
 
 
 28
 ... anything that is prospective in nature is necessarily uncertain. We are not here dealing with certainties, but with reasonable likelihood or probability. This must be something more than a mere hope or the innate optimism of the salesman. As the Superior Court of New Jersey has put it, "... the rule to be applied ... is that the broker may recover when the jury is satisfied that but for the wrongful acts of the defendant it is reasonably probable that the plaintiff would have effected the sale of the property and received a commission." Myers v. Arcadio, Inc., 73 N.J.Super. 493, 497, 180 A.2d 329, 331 (1962) (Emphasis ours). This is an objective standard which of course must be supplied by adequate proof. (footnote omitted).
 
 
 29
 In reviewing a motion for judgment n.o.v., we are required to "determine whether the evidence and justifiable inference most favorable to the prevailing party afford any rational basis for the verdict." Berndt v. Kaiser Aluminum & Chemical Sales, Inc., 789 F.2d 253, 258 (3d Cir.1986), (quoting Zegan v. Central R.R. Co. of New Jersey, 266 F.2d 101, 104 (3d Cir.1959)). In its opinion, the district court summarized, the relevant evidence as follows:
 
 
 30
 At trial, plaintiff presented two arguments that Billcon was liable in tort: (1) that Billcon interfered with plaintiff's supply of Billcon machines, and (2) that Billcon interfered with plaintiff's ability to advertise to customers.[6]
 
 
 31
 The evidence to which the district court refers, viewed in light of our quite circumscribed review of the jury verdict, amply supports the jury's conclusion that Billcon tortiously interfered with Orlando's business.
 
 
 32
 As an alternative ground for setting aside the jury's award of punitive damages, the trial court noted that Orlando did not present sufficient evidence from which the jury could conclude that Billcon's conduct was outrageous, or that it acted in reckless disregard of plaintiff's rights as required by Pennsylvania law. See Certified Laboratories of Texas, Inc. v. Rubinson, 303 F.Supp. 1014, 1025 (E.D.Pa.1969); Richette v. Pennsylvania Railroad, 410 Pa. 6, 16-17, 187 A.2d 910, 916 (1963). However, plaintiff did proffer sufficient evidence. See supra section I (Statement of Facts).
 
 
 33
 As defined by the Pennsylvania courts, the malice or reckless indifference to the interests of others that must be established to support a finding of outrageousness is not necessarily malignant scheming. Rather, it "encompasses that kind of conduct which is so wholly reckless of another's rights as to call for a monetary penalty." Richette, 410 Pa. at 17, 187 A.2d at 916. In Richette, the court held that the "use of ... threats, all accruing to the serious disadvantage of the persons involved, may well be interpreted as reflecting that kind of malice ... which would call for punitive damages." 410 Pa. at 15, 187 A.2d at 915. The instant case also involves threats. From the evidence presented at trial, the jury reasonably could have concluded that Billcon's threats of termination to Orlando's suppliers were not made to better its own business, but were actually contrary to those interests. Moreover, Billcon had no dealership relationship with Ronald Brunner, Orlando's replacement, who was permitted to obtain his supply of Billcon products from another Billcon dealer, while efforts were made to cut off Orlando's supply.
 
 
 34
 In addition to these threats, the jury properly could have found that Billcon's actions in disclosing the names of Billcon's suppliers to Ronald Brunner so that Brunner could importune them was in reckless disregard of Orlando's relationship with those suppliers. Reckless indifference simply means that "the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." Evans v. Philadelphia Transportation Co., 418 Pa. 567, 574, 212 A.2d 440, 443 (1965) (quoting Prosser, Torts Sec. 33 at 151 (2d ed. 1955)). Billcon should have been aware of the obvious risk that Ronald Brunner would use the names of Orlando's suppliers to importune and to threaten them. The combination of threats from both Billcon and from Brunner might well have induced Orlando's suppliers to stop dealing with him. Thus the district court erred in holding that Orlando's evidence would not sustain an award of punitive damages.[1]
 
 III.
 
 35
 Billcon contends that the district court erred in denying its motion for judgment notwithstanding the verdict on Orlando's breach of contract claim. Paragraph 17 of the dealer contract provides it "shall be interpreted and enforced under the laws of the State of California." Section 1638 of the California Civil Code provides:
 
 
 36
 The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.
 
 
 37
 Billcon claims that the district court failed to follow Sec. 1638 by submitting to the jury the issue of whether Orlando breached the contract by failing to meet the monthly quota attached to the contract. Billcon argues that since the agreement contains no ambiguity regarding the quota and the evidence was uncontradicted regarding the dollar volume of Orlando's purchases, the only conclusion that could be reached was that Orlando materially breached the quota provision, thereby relieving Billcon of any obligation to negotiate in good faith for an extension of the agreement. The difficulty with Billcon's argument, however, is that it ignores the equally clear language in paragraph 10 providing for written notice of any material breach and for an opportunity to cure it within 30 days. It is undisputed that Billcon never gave Orlando any notice, written or oral, that its level of purchases was a material breach. Moreover there is testimony by Billcon officials from which the jury could conclude that Orlando's termination had nothing to do with the sales quota provision. Indeed, Billcon's sales manager testified that "in this particular contract we don't know what [the quota] means." Thus we find no error in submitting the question of breach of the quota provision to the jury. In light of paragraph 10 and the absence of notice, Billcon may have received more favorable consideration by having the issue submitted than it was entitled to.
 
 
 38
 Billcon also contends that the court erred in submitting to the jury Special Interrogatory No. 5 respecting Billcon's duty to negotiate in good faith for a continuance of the dealership contract. Apparently Billcon contends that as a matter of law it had no obligation to initiate negotiations before January 31, 1981, and no obligation to participate in negotiations thereafter. Such an interpretation would deprive paragraph 16 of any meaning. Moreover the jury could find from the evidence that Billcon took steps, before and after January 31, 1981, which led Orlando to believe that his dealership contract was being extended.
 
 
 39
 Finally Billcon urges that it is entitled to a judgment notwithstanding the verdict because of Orlando's failure to pay for equipment shipped to him in August, 1981. This failure, Billcon urges, was a separate material breach of contract. The goods in question were shipped, however, after the August 4, 1981 termination notice. Failure to pay for them cannot be held to be a material breach of the agreement that Billcon already had terminated.
 
 
 40
 Alternatively Billcon urges that the jury's award of $175,000 in compensatory damages on the breach of contract claim should have been set aside because of insufficient evidence. That contention was preserved in the motion for a directed verdict. It must, however, be rejected.
 
 
 41
 At trial, Orlando testified that he suffered $283,850 in losses from Billcon's termination of the contract. The jury awarded $175,000 in damages from Billcon's breach of contract. Although Billcon argues that there was no proof that Orlando would have continued as a Billcon dealer until 1985, there was ample testimony from which the jury could infer that but for Billcon's conduct Orlando would have remained one of its dealers throughout the period. Orlando testified that Billcon assured him that he would remain one of its dealers for as long as he sold its machines and paid his bills. Billcon's sales manager testified that Orlando "was one of the few guys that always paid his bills on time," that "since very few dealers did ... [Orlando] was well thought of for being a prompt payer," and that "Lou Orlando and Time, Date and Number was held very high in esteem when I first came to Billcon." Although Billcon's president testified that although other dealers had more purchases from Billcon in 1980 than Orlando and named five such dealers, the jury was entitled to conclude from the balance of the evidence that Orlando's performance was satisfactory and that Orlando would have continued as a Billcon dealer through 1985, had Billcon negotiated an extension in good faith.
 
 
 42
 Second, Billcon argues that since sales of its equipment "fell precipitously after 1981" that it is reasonable to infer from the evidence that had Orlando remained a Billcon dealer after the termination his sales would have dropped accordingly. Thus, it urges that Orlando was "blessed" by the termination as his sales increased dramatically after he acquired the Japanese manufactured line.
 
 
 43
 Although Billcon claims that Orlando benefited from the termination of his relationship with Billcon, the district court properly recognized that Billcon's approach incorrectly compared net profits before and after the breach. The argument that Billcon is not entitled to recover damages because he successfully rebuilt his business lacks merit. See Lucky Auto Supply v. Turner, 244 Cal.App.2d 872, 53 Cal.Rptr. 628 (1966) (damages appropriate even if plaintiff's business increased where an adverse effect is shown from defendant's wrong).
 
 
 44
 Orlando's damages were calculated on the basis of lost profits. The evidence consisted of Orlando's analysis of his sales history just prior to the breach and his projection as to the amount of sales he would have been able to make had Billcon not terminated their relationship. Orlando's projections were based on an application of his company's profit margin to his sales figures immediately prior to trial to arrive at his lost net profits. He further testified that although he eventually regained his previous level of sales through promoting the Japanese manufactured line, it took him several extra years to recover the level of sales that he expected given the history of his increases in business. In response, Billcon presented testimony that Orlando's projected sales were grossly overestimated. However, the credibility of the witnesses was for the jury to resolve. The jury was free to disbelieve the testimony offered by Billcon. Indeed, Orlando had explained to the jury that even though Billcon's business had dropped, his sales would have increased because of his sales of equipment to major institutions, which usually maintain some uniformity in their equipment by repeatedly buying the same brand. Lastly, Orlando took into account the gains he made by reason of acquiring the Japanese manufactured line in calculating his lost profits from lost sales. Consequently, there was ample support for the $175,000 compensatory damage award.
 
 
 45
 We come, finally, to Billcon's appeal from the denial of its new trial motion. To the extent that appeal is predicated on deficiencies in the evidence, our discussion of the motion for judgment notwithstanding the verdict establishes that the district court did not commit an abuse of discretion in holding that a new trial on the contract claim is unwarranted. Billcon also finds fault, however, with the court's instructions and in the jury interrogatories.
 
 
 46
 Billcon faults the district court for refusing to include in its charge to the jury an instruction that Billcon was not under an obligation to negotiate an extension of the contract if Orlando breached the contract's quota provision. However, the trial court did charge the jury:
 
 
 47
 Now, if you find that Mr. Orlando breached the contract by failing to meet whatever quota was imposed, and if you find that the breach was not waived by Billcon International, then I instruct you as a matter of law that Billcon cannot be liable for a breach of contract. In other words, if Orlando was obligated to make certain purchases, and if he didn't make them, and if Billcon International did not waive his failure to make them, then Billcon International is excused from its omission to negotiate in good faith for the renewal or extension of the contract upon the same terms and conditions.
 
 
 48
 Considering the language of paragraph 10 of the contract, this instruction was perhaps more than Billcon was entitled to.
 
 
 49
 Billcon also claims that the wording of Special Interrogatories Nos. 7 and 8 was improper or misleading. First, Billcon argues that Special Interrogatory No. 7 should have referred to negotiations for an "extension" of the contract as opposed to a "renewal" of the contract. Since the question asked the jury whether Billcon breached the contract by failing to negotiate in good faith for the "renewal" of the contract, Billcon claims the question was prejudicial since "renew" refers to a new contract which could have been entered into after January 31, 1981 but was not, while "extend" means action within the term of the agreement. However, the question was fairly worded since Webster's Ninth New Collegiate Dictionary defines "to renew" as "to grant or obtain an extension of or on." Webster's Ninth New Collegiate Dictionary 997 (9th ed. 1986). Second, Billcon argues that Special Interrogatory No. 7 needed an antecedent question asking whether Billcon was under a duty to initiate negotiations. The trial court properly ruled, however, that the ultimate issue was whether there was a breach of an obligation in the contract to negotiate and that the additional question was unnecessary. Third, Billcon objects to the reference in Special Interrogatory No. 8 to a "dealer sales arrangement." It argues that the question should have referred to a "dealer sales agreement" because an agreement "requires a defined and mutually acceptable set of terms," whereas an arrangement "may have no legal existence or criteria at all." However, this wording did not prejudice Billcon. The term "arrangement" was proper because it refers to an understanding between the parties. The dealer sales agreement did not require a separate, written agreement to extend the agreement. Summarizing, none of Billcon's objections to the form or content of the interrogatories establish an abuse of the discretion committed by Fed.R.Civ.P. 49(b) to the district court respecting their form and content. See Stanton ex rel. Brooks v. Astra Pharmaceutical Products, Inc., 718 F.2d 553 (3d Cir.1983).
 
 IV.
 
 50
 The district court erred in granting Billcon's motion for judgment notwithstanding the verdict on the awards of compensatory and punitive damages on Orlando's tortious interference claim. The court did not err in denying Billcon's motions for a judgment notwithstanding the verdict or a new trial on Orlando's breach of contract claim. The judgment in Orlando's favor for $175,000 in compensatory damages will therefore be affirmed. The order granting judgment notwithstanding the verdict of $82,000 in compensatory and $125,000 in punitive damages will be reversed, and the case will be remanded for the entry of a judgment on those verdicts.
 
 
 
 *
 Hon. Barron P. McCune, United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [6]
 With regard to the first, Rees testified that Billcon dealers complained that plaintiff was selling Billcon equipment; that Billcon asked complainants for the serial numbers of the machines sold by plaintiff so that it could trace which Billcon dealers sold them to plaintiff; that Billcon threatened to cancel dealers who sold to plaintiff; and that Billcon did cancel one such dealer. Rees 3.103 line 13--3.104 line 17 [A 185-186]. Plaintiff also testified that because his sources of Billcon equipment dried up, he began to sell other companies' equipment; and that, when he returned to his old customers with the different equipment, they were not interested in buying from him because he no longer sold Billcon equipment. 1.125 lines 1-16 [A 121]
 With regard to plaintiff's second argument, plaintiff introduced evidence that Billcon's lawyer sent the "Yellow Pages" a letter dated December 5, 1981, advising that plaintiff's company was no longer an authorized dealer for Billcon Products, and should not be permitted to run a listing with any reference to Billcon. Orlando 1.127 lines 1-8; Ex. P-34 [A 123; 359]. Plaintiff testified that thereafter, he was not permitted to place an ad in the Yellow Pages even stating simply that he was selling Billcon Products. 1.127 line 9-13.
 
 
 [1]
 Although any question as to the amount of damages was not preserved in Billcon's motion for a directed verdict, we note that there was evidence from which the jury could estimate Billcon's worth, and thus the amount of an appropriate award