**Leonard ZACK**

v.

**NCR CORPORATION.**

**Civ. A. No. 89–8506.**

United States District Court, E.D. Pennsylvania.

June 21, 1990.

Edward L. Wolf, Segal, Wolf, Berk, Gaines & Liss, P.C., Philadelphia, Pa., for plaintiff.

Ira P. Tiger, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendant.

### MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

The plaintiff in this case, an attorney, alleges that representatives of defendant NCR Corporation tortiously interfered with a contingency fee contract into which he

and a client had entered. His theory is that NCR personnel demanded, as a condition precedent to a settlement agreement between NCR and his client, that the client fire the plaintiff. Subject matter jurisdiction is predicated on the parties' diversity of citizenship, 28 U.S.C. § 1332, and Pennsylvania law governs the action. Having held a bench trial on June 13–14, 1990, the Court finds in favor of the defendant.

## I. Findings of Fact

Armand Mancini owns Automotive Remanufacturers, Inc. (ARI), a Pennsylvania corporation. Prior to 1988, ARI consummated with NCR various lease agreements for business computer equipment. Mancini, disappointed with the performance of the computers, consulted Leonard Zack, who has served as Mancini's attorney for twenty years. By letter dated September 9, 1988, Zack and Mancini agreed that Zack would represent ARI in litigation against NCR for "one-third of any total recovery."

In early December 1988, Nicholas Donatiello, then an assistant vice president of NCR, instructed John Markelwith, an NCR sales representative, to set up a January 13th meeting with Mancini. Donatiello, who was unaware that ARI had retained counsel, hoped to rectify the ongoing dispute over the equipment. On December 13, Zack filed for ARI a breach of contract action against NCR. NCR in turn retained Gerard St. John, a partner at Schnader, Harrison, Segal & Lewis in Philadelphia, to defend the company.

The day before the scheduled meeting, Zack, St. John, and Raymond Fitzsimmons of NCR's legal department conferred by telephone. St. John informed Zack that he could not attend the conference. Although Fitzsimmons volunteered to appear in St. John's place, the plaintiff refused to permit it. Zack declared the meeting cancelled.

On the morning of January 13, Donatiello, who already had travelled to Philadelphia, learned that the conference was off. He called Mancini and proposed that it go forward without the lawyers. Mancini agreed. After an hour-long discussion at ARI's offices and on the telephone, Donatiello and Mancini settled the ARI–NCR dispute. Shortly afterward, Mancini told an angry Zack that the parties had resolved the conflict.

On January 26, Donatiello sent to Mancini a proposed Release Agreement, along with a cover letter. The letter stated in part:

> Please sign the release and return it to me. ... I am told that, to avoid any attorney lien problems, as well as any problems related to your attorney maintaining this agreement in confidence, we will have to make our check ... payable to both Automotive Remanufacturers, Inc. and Leonard Zack as its attorney. If this creates any problems for you, please let me know.

Letter from N. Donatiello to A. Mancini, Jan. 25, 1989 (Def. Ex. 3). Mancini called Donatiello and told him that the inclusion of Zack's name on the settlement check was not part of the bargain. Donatiello replied that the check had to be payable to both Mancini and Zack unless Mancini provided documentation that he had "taken care of" the lawyer. As he testified at trial, Mancini would not have accepted the settlement if Zack's name appeared on the check. On January 31, Mancini sent Donatiello a letter, which was addressed to the plaintiff and backdated to January 13th. He wrote: "We have settled the case with N.C.R., and will no longer be needing your services. If there are any charges, please mail me the bill." Letter from A. Mancini to L. Zack, Jan. 13, 1989 (Def. Ex. 5). Donatiello forwarded the communication to NCR's legal department.

On February 8, at the request of NCR lawyers, St. John telephoned Zack and asked him whether he wanted his name on the settlement check. Zack said, "No." After St. John informed NCR of this, NCR mailed Mancini a check made payable to ARI only. During the following week, Mancini, although he did not believe he owed Zack any money because he had settled the case himself, sent the plaintiff $5,000 for the NCR work.

## II. Conclusions of Law

The Pennsylvania Supreme Court has long held that if one intentionally inter-

feres in a contract between two parties "and induces one of them to break that contract to the injury of the other, the party injured can maintain an action against the wrongdoer." *Caskie v. Philadelphia Rapid Transit Co.*, 321 Pa. 157, 159, 184 A. 17, 18 (1936) (quoting *Angle v. Chicago, St. P., M. & O. Ry. Co.*, 151 U.S. 1, 13, 14 S.Ct. 240, 245, 38 L.Ed. 55 (1894)). *Accord Capecci v. Liberty Corp.*, 406 Pa. 197, 176 A.2d 664 (1962); *Birl v. Philadelphia Elec. Co.*, 402 Pa. 297, 167 A.2d 472 (1960); *Dora v. Dora*, 392 Pa. 433, 141 A.2d 587 (1958); *Vanarsdale v. Laverty*, 69 Pa. 103 (1871). This rule protects valid contingency fee contracts between lawyers and their clients from unlawful disruption by third parties. *Richette v. Solomon*, 410 Pa. 6, 187 A.2d 910, 912 (1963) (stating that if client's decision to terminate attorney "is the result of coercion or misrepresentation practiced by others, the intervenors are answerable in law as anyone else would be liable for causing the rupture of a binding contract."); *Klauder v. Cregar*, 327 Pa. 1, 192 A. 667, 668–70 (1937) (holding insurance company liable when plaintiff's client settled litigation in reliance on agent's statement that she would not have to honor contingency fee agreement if she settled out of court). To establish that NCR tortiously interfered with the fee contract between Zack and Mancini, the plaintiff must demonstrate (1) that a contract existed, (2) that NCR representatives had the purpose or intent to harm Zack by preventing the completion of the contractual relation, (3) that NCR engaged in conduct which was improper as a matter of law and which the Court, sitting as the trier of fact, reasonably could find improper, and (4) that NCR's conduct caused Zack actual harm. *Silver v. Mendel*, 894 F.2d 598, 604–05 (3d Cir.) (citing *Adler, Barish v. Epstein*, 482 Pa. 416, 393 A.2d 1175, 1183 (1978)), *cert. denied*, —— U.S. ——, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990). Although the plaintiff has established the initial requisite, he founders on the remaining three.

NCR's actions were not intentionally tortious. The evidence indicates that in fact the defendant took reasonable affirmative steps to protect Zack's interests. Donatiello told Mancini that he needed to "tak[e] care of" the lawyer. Under the circumstances, this statement meant not that Mancini was required to fire Zack. Rather, it evinced a purpose to ensure that Mancini pay Zack for his services. Donatiello stated so in his communication of January 25, 1990, and NCR personnel, still not convinced by Mancini's termination letter to Zack, later enlisted St. John to ask Zack explicitly whether he wanted his name on the check. It would make scant sense for NCR, bent on surreptitiously and illicitly divesting the plaintiff of his fee, to seek his permission to do just that. If anything, NCR made satisfaction of the ARI debt to Zack a condition precedent to its payment of settlement. Such conduct is proper, both as a matter of law and within the confines of this factual setting.

Even assuming that Donatiello had conditioned the settlement on Mancini's termination of Zack, the plaintiff failed to prove that this action induced Mancini's refusal to honor the contingency fee contract. As he unequivocally testified, Mancini would not have accepted, in any event, the release if NCR's check bore Zack's name. He also opined that because the ARI–NCR case had not gone to trial and because he himself had resolved the dispute, ARI was not obliged to pay Zack one-third of the settlement monies recovered. Although Mancini's view is perhaps incorrect as a legal matter, his testimony shows that Donatiello's comment did not incite Mancini's conduct. Mancini's independent, preexisting belief about the scope of the fee agreement alone produced the breach. As such, Donatiello's statement, even if construed as deliberately wrongful, was not a substantial factor in Mancini's decision to disregard the agreement. *See generally Keifer v. Cramer*, 356 Pa. 96, 51 A.2d 694, 695 (1947) ("In this class of cases, as in all others, there must be proof of damage resulting from the alleged interference with contractual relations."); Restatement (Second) of Torts § 766 comment o.

Although a breach of the Pennsylvania Rules of Professional Conduct does not give rise to a cause of action, some partici-

pants in this litigation attempted to develop at trial the thesis that it is unethical or tortious for clients, once represented by attorneys, to resolve their disputes without the blessings of counsel. Many members of the bar hold this misconception. The Court initially notes that it was not improper for Mancini to fire Zack. "A client has a right to discharge a lawyer at any time, with or without cause, subject to liability for payment for the lawyer's services." Pa. Rules of Professional Conduct Rule 1.16 comment. The Rules do forbid a lawyer to communicate with a represented party "about the subject of the representation ... unless the lawyer has the consent of the other lawyer or is authorized by law to do so." *Id.* Rule 4.2. But, of course, the Rules do not purport to circumscribe the actions of laypersons—except in the negative sense that they repose in attorneys certain duties which clients cannot veto, *see, e.g., id.* preamble & Rule 1.2—and the commentary to Rule 4.2 in particular recognizes that "parties to a matter may communicate directly with each other." Further, the rationale undergirding Rule 4.2, which attempts to protect those unschooled in law from the overreaching of attorneys, has no application to laypersons.

■ It is a basic principle of the American system of justice that, with narrow qualifications, the client defines the objectives of the lawyer's service. *See id.* Rule 1.2. As a necessary concomitant of this notion, an attorney must "abide by a client's decision whether to accept an offer of settlement of a matter." *Id.* This means not only that a lawyer lacks authority to accept a settlement offer without the client's consent, *see, e.g., International Org. Masters, Mates and Pilots, Local No. 2 v. International Org. Masters, Mates and Pilots, Inc.,* 456 Pa. 436, 318 A.2d 918 (1974), but also that the client may enter into a settlement without the lawyer's knowledge or approval. *Cross v. American Country Ins. Co.,* 875 F.2d 625, 631 (7th Cir.1989); *Lewis v. S.S. Baune,* 534 F.2d 1115, 1122 (5th Cir.1976) (citing multiple cases); *Wahl v. Strous,* 344 Pa. 402, 25 A.2d 820, 822 (1942); Survey, *Developments in Maryland Law, 1986–87,* 47 Md. L.Rev. 739, 1023 (1988) ("[T]he great weight of authority sustains the right of a client at any time before judgment, if, acting in good faith, to compromise, settle or dismiss [a] cause of action without [the] attorney's intervention, knowledge or consent." (quoting *Boyd v. Johnson,* 145 Md. 385, 389, 125 A. 697, 698 (1924)).

> The employment of an attorney does not take away the litigant's right to settle his claim ... even if the attorney knows nothing of his purpose, or is opposed to its being carried out.... [The client] loses no right to control over the suit merely because he has agreed to pay [an attorney] either a reasonable sum for his services or a sum contingent upon success.

*Rose v. Fretz,* 109 F. 810, 813 (C.C.E.D.Pa. 1901). Indeed, so acute is a client's autonomy interest in this respect that "contract clauses prohibiting a client from settling a lawsuit without his lawyer's consent are generally void as against public policy." Brickman & Cunningham, *Nonrefundable Retainers: Impermissible Under Fiduciary, Statutory and Contract Law,* 57 Fordham L.Rev. 149, 159–60 (1988); *see also* Pa. Rules of Professional Conduct Rule 1.2 comment ("[T]he client may not be asked ... to surrender ... the right to settle litigation that the lawyer might wish to continue."); *Wahl, supra;* Note, Evans v. Jeff D.: *Putting Private Attorneys General on Waiver,* 41 Vand.L.Rev. 1273, 1305 n. 202 (1988). There was, then, nothing untoward, let alone illegal or actionable, about Donatiello and Mancini amicably resolving their differences by themselves, even though attorneys had been retained and a lawsuit had been filed.

## ORDER

AND NOW, this 21st day of June, 1990; for the reasons set forth in this Court's Memorandum of June 21, 1990;

IT IS ORDERED that the verdict and judgment in the above-captioned action is ENTERED against Plaintiff Leonard Zack and in favor of Defendant NCR Corporation.