**In re Anonymous Nos. 55 D.B. 91 and 56 D.B. 91**

Disciplinary Board Docket nos. 55 D.B. 91 and 56 D.B. 91.

January 30, 1995—

## I. HISTORY OF PROCEEDINGS

On May 15, 1991, the Office of Disciplinary Counsel filed a petition for discipline against respondent [1] and respondent [2].

On July 2, 1991, respondents filed an answer to petition for discipline and request to be heard in mitigation.

On July 3, 1991, the matter was referred to Hearing Committee [ ], chaired by [ ], Esquire, and included members [ ], Esquire, and [ ], Esquire. A hearing was held on November 18, 1991 and a continued hearing was held on May 19, 1992.

On December 7, 1992, the Hearing Committee filed its report (under the abbreviated procedure provided for under Board Rule 89.181) unanimously recommending that the charges filed against both respondents be dismissed.

The board adjudicated the matter at its December 18, 1992 meeting. By order dated December 28, 1992, the Disciplinary Board remanded the proceeding to Hearing Committee [ ] to fix a briefing schedule and submit formal findings of fact and recommendations to the board.

On January 29, 1993, a joint brief of respondents and petitioner was filed with the Hearing Committee, and on March 9, 1993, the committee filed a formal report and recommendation with the board, again unanimously recommending that the charges against both respondents be dismissed.

The board adjudicated the matter at its meeting on April 23, 1993.

## II. FINDINGS OF FACT

(1) Petitioner, whose principal office is now located at Suite 400, Union Trust Building, 501 Grant Street, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving alleged misconduct of any attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent, [1], Esquire, was born in 1939, was admitted to practice law in the Commonwealth of Pennsylvania in 1964, and his principal office is located at [    ].

(3) Respondent, [2] (formerly [    ]), Esquire, was born in 1958, was admitted to practice law in the Commonwealth of Pennsylvania in 1983, and her office is located at [    ].

(4) [A] and [B] were the unmarried parents of a minor child, [C], who was born out of wedlock on April 30, 1985. (P/D 4, P/D ans. 4.)

(5) On or about October 1, 1987, [B], while passenger in a vehicle driven by [D], was killed in an automobile collision in which one other passenger was also killed and a third passenger was injured. (P/D 5, P/D ans. 5.)

(6) On December 1, 1987, pursuant to Ethical Consideration 2-19 of the (former) Pennsylvania Code of Professional Responsibility, [A] signed a power of attorney with the firm of [E], for representation on a

contingent fee basis regarding the death of [B]. (P/D 6, P/D ans. 6.)

(7) Respondent [1] was a named shareholder in this firm. The firm's name was subsequently changed to [F], and respondent [2] was an associate attorney employed by the firm. (P/D 7, P/D ans. 7.)

(8) Respondent [1] at all times had direct supervisory authority over respondent. [2]. (P/D 8, P/D ans. 8.)

(9) On March 7, 1988, with the aid of respondent [2], [A] was granted letters of administration for the estate of [B] on the sole basis that she was the mother of [B's] minor child, [C]. (P/D 9, P/D ans. 9; PE 17, p. 8.)

(10) On March 23, 1988, on behalf of the natural guardian of [C], respondent [2] filed a lawsuit against [D], which included:

(a) A survival action on behalf of the estate of [B]; and

(b) A wrongful death action on behalf of [C]. (P/D 10, P/D ans. 10.)

(11) In about late 1988, an issue regarding potential underinsured motorist coverage, which would be available to a surviving spouse, was pressed by [A] with respondent [2] based upon [A's] discussions with another attorney, [G]. Those discussions were unknown to the [F] firm at that time. (PE 2A; N.T. I 43 et seq.)

(a) The claim with [A's] own carrier for UIM coverage depended upon the existence of a common-law marriage between [A] and [B], which had previously been denied by [A] (PE 2B; RE 2);

(b) At [A's] insistence, respondent [2] reluctantly communicated with the UIM carrier about possible coverage, while warning [A] that these efforts could foreseeably

result in a conflict between the interests of [A] and her minor child. (RE 2.)

(12) In about early December 1988, a tentative settlement agreement was reached with [D's] insurance company by respondent [2] on behalf of the estate and [C], as one party, and one of the two other possible claimants. (P/D 12, P/D ans. 12.)

(13) The tentative settlement agreement proposed to equally divide among the three possible claimants the $50,000 liability insurance coverage which [D] had, but still required an effort to obtain the approval of the third claimant. (P/D 13, P/D ans. 13.)

(14) The attorney for [D], [H], undertook to get the approval of the third injured party, but was unable to do so until about late August 1989. (RE 6, RE 7; N.T. I 171-172, 206 et seq.)

(15) In or about late January 1989, material differences arose between respondent [2] and [A], concerning the issue of whether [A's] efforts regarding UIM coverage engendered a potential conflict with her child's interests. (RE 2.)

(16) [A] notified respondent [1's] firm, including respondent [2], that they were discharged by a February 28, 1989 letter received by the [F] firm in early March 1989. By implication, the discharge purported to apply to the [F] firm's representation of the minor child and the estate. The letter further stated that [A] was still searching for substitute counsel. (P/D 17, P/D ans. 17; PE 3.)

(17) At respondent [1's] instruction, respondent [2] discontinued further representation of [A], and the firm simply maintained its appearance on the record pending the entry of appearance by prospective new counsel. (P/D 18, P/D ans. 18; N.T. I 148-149 & 212.)

(18) By letter dated April 20, 1989, Attorney [I] informed respondent [2], inter alia, that:

(a) [A] had asked Attorney [G] to take over [A's] case;

(b) [G] had asked her to contact respondent [2] to discuss payment of the [F] firm's fees and expenses; and

(c) [I] wanted respondent [2] to send her a copy of the firm's fee agreement with [A]. In fact, [G] testified that he had undertaken representation initially (unbeknownst to the [F] firm), procrastinated in regard there, and then asked [I] to take over. (PE 4; N.T. I 43-54.)

(19) Neither [I] nor [G] had entered an appearance of record as of April 20, 1989. In fact, no written fee agreement was entered into between [I] and [A] until five months later. Moreover, although [G's] name was included on said belated fee agreement, he was not made aware of same. (PE 5, PE 13; N.T. I 54-55, 122-123, 137-138, 161-162, 168-171.)

(20) By letter to [I], dated May 15, 1989, which was sent at the direction of respondent [1], respondent [2] enclosed her firm's fee agreement with [A], and asserted her firm's claim for either immediate payment of its hourly charges and expenses or an equal allocation of any contingent fee payable at the conclusion of the case. (P/D 20 & 21, P/D ans. 20 & 21; PE 6.)

(21) Attorney [I] did not communicate the contents of this letter to [A]. (P/D 22, P/D ans. 22.)

(22) During the next two and one-half months, respondent [2] and [I] exchanged communications in good faith relating to the dispute over compensation due the [F] firm and the release of a retaining lien validity asserted by the [F] firm. (PEs 8, 9 & 10; N.T. I 130.) During this time:

(a) Neither [I] nor any other attorney entered an appearance of record for the estate of [B];

(b) Neither [I] nor any other attorney requested the [F] firm to withdraw its appearance from the docket; and

(c) Neither [I] nor [G] had a written fee agreement to represent [A]. (PE 5, PE 13; N.T. I 52-55, 137-138, 161-162 & 168-170.)

(23) In early August 1989, [I] advised [A] to personally take steps to contact the [F] firm concerning the file. (N.T. I 149.)

(24) By letter to [A] dated August 10, 1989, a copy of which was sent to Attorney [I], respondent [1] confirmed [A's] call to him that morning, wherein they had discussed the terms of his firm's prior offer for division of fees and reimbursement of expenses. In addition, respondent [1] enclosed a copy of respondent [2's] May 15, 1989 letter to [I]. (PE 11.)

(25) On or about August 30, 1989, [I] initiated telephone contact with Attorney [H]. (N.T. I 212-214.) In this call:

(a) [I] sought approval to amend the civil complaint so as to allege a common-law marriage between [A] and [B] and pursue the purported individual right of [A] to recovery;

(b) [H] refused to agree to such an amendment, advising [I] that if she did that "it would cut the child out and give all the money to the mother (*i.e.,* [A])."

(26) Respondent [2], pursuant to respondent [1's] instructions, again contacted [A] by a letter dated August 31, 1989, a copy of which she also sent to Attorney [I]. (PE 12; P/D 28, P/D ans. 28.) In that letter, respondent [2], inter alia:

(a) Stated that she had not heard from [A] or her new attorney concerning her decision over allocating fees;

(b) Stated that she had just received releases from [D's] insurance company (as [H] had finally been able to obtain approval from the third claimant);

(c) Discussed [A's] possible entitlement to the $15,000 in underinsured motorist coverage; and

(d) Pointed out an apparent inconsistency between [I's] prior advice that [A] had turned down the proposed equal allocation of attorneys' fees and [A's] statement to respondent [1] that this proposal had never been conveyed to her.

(27) [I] finally entered her appearance in the matter on behalf of [A] on September 1, 1989, although proper notice was not provided to the [F] firm. As of September 1, 1989, [I] still had no written fee agreement with [A]. (N.T. I 168-169, 137-138.)

(28) By letter to respondent [2] dated September 1, 1989 (PE 13), Attorney [I]:

(a) Acknowledged that they had had an apparent mis-understanding and that confusion existed regarding the allocation of fees;

(b) Again offered to pay $500 up front for respondents' firm's costs and expenses and to pay respondents' firm's hourly fees out of the potential settlement;

(c) Denied having stated to respondent [2] that [A] had turned down the proposed allocation of attorneys' fees inasmuch as she had never discussed the [F] firm's proposal with [A];

(d) Asserted [A's] right to her file; and

(e) For the first time, advised that she was entering her appearance in the case and requested that respondent [2] withdraw her appearance.

(29) On or about September 12, 1989, Attorney [H] and respondent [2] spoke by telephone at which time [H] gave his opinion that respondent [2] should not withdraw her appearance, because of potential problems he foresaw relating to the child's interests and based upon his knowledge of local procedural practices in [    ] County. (N.T. I 212-218; RE 8.)

(30) By letter to Attorney [H] dated September 14, 1989 and copied to [I] (RE 8; PE 14), respondent [2] with respondent [1's] approval:

(a) Confirmed their telephone conversation of September 12, 1989;

(b) Stated that she and her firm had been discharged by [A] and that [A] had secured her counsel;

(c) Stated that there "has not been any agreement as to the division of fees nor representation, so I, therefore, will not withdraw my appearance"; and

(d) Acknowledged her lack of authority to enter any settlement agreement for [A] and advised that she would keep [H] apprised of further occurrences.

Said letter did not state or even imply that the [F] firm represented [A], the infant, or the estate, and was informational only.

(31) By letter to respondent [2] dated September 30, 1989, Attorney [I] stated her opinion that respondent [2] had a duty to withdraw from the record. (PE 15.) On the same date, [I] finally entered into a written fee agreement with [A], on which she included [G's] name without his knowledge and also caused [A] to verify a petition to settle the case. (PE 5; N.T. I 54-55, 122-123, 137-138, 189-190; N.T. II 69-72.)

(32) On or about September 25, 1989, [I] filed a motion to strike respondent [2's] appearance. (PE 16A; P/D 34, P/D ans. 34.)

(33) On or about September 29, 1989, respondent [2] filed a response to the motion to strike, in which she formally asserted the possible conflict of interest between [A] and her infant son. (P/D 35, P/D ans. 35.)

(34) On October 2, 1989, argument was heard on Attorney [I's] motion to strike, at which time [I] indicated that the proposed amendment of the complaint to assert personal claims for [A] had been abandoned and that [A] was only acting on behalf of her minor child. (PE 17.)

(35) By order dated October 16, 1989, the motion to strike respondents' appearance was granted. (PE 18.)

(36) [I] finalized settlement of the third party claim on the same terms that respondent [2] had negotiated in December 1988, without the need for any of the file records in the possession of the [F] firm. (PE 19; N.T. I 189-190.)

(37) The [F] firm never received any fees in this matter, nor did the firm receive the bulk of the litigation expenses and costs they had advanced *(i.e.,* they were reimbursed only for record costs amounting to less than $100. (N.T. I 184-185.)

(38) Upon final settlement of the case, and after filing the disciplinary complaint on September 29, 1989, [I] destroyed her own time records relating to representation of [A], the infant, and the estate. (N.T. I 176-184; RE 3.)

(39) Based upon uncontroverted, accepted custom and practice, when a plaintiff's counsel is discharged in a personal injury case, he or she acts properly in ceasing representation and simply maintaining his or her appearance on the docket pending entry of appearance by successor counsel and resolution of a potential

conflict relating to a minor. (N.T. II 4 et seq., 21 et seq., & 38 et seq.)

(40) Respondent [1] has been an active trial lawyer for over 28 years. He is very involved in national, state and local trial lawyer organizations, and has an excellent reputation nationally and in Pennsylvania as a skilled and ethical practitioner. (N.T. II 4 et seq., 21 et seq., & 38 et seq.)

### III. DISCUSSION

Respondents were charged with violating Rule 1.16 of the Rules of Professional Conduct particularly subsection (d) which states: "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, *surrendering papers and other property to which the client is entitled* and refunding any advance payment of fee that has not been earned. *The lawyer may retain papers relating to the client to the extent permitted by the law.*" (emphasis added) There are no comments to the Rules of Professional Conduct explaining when it is appropriate for an attorney to retain papers and when after being requested to do so, a lawyer must surrender papers.

In Pennsylvania, the relationship between an attorney and a client is contractual. Nevertheless, a client may terminate the relationship at any time. *Richette v. Pennsylvania Railroad,* 410 Pa. 6, 187 A.2d 910 (1963). The attorney, on the other hand, may withdraw from representation only for reasonable cause and upon reasonable notice. *Spector v. Greenstein,* 85 Pa. Super. 177 (1925). Pennsylvania recognizes that contingent fee agreements are lawful and binding on the parties thereto.

When a client terminates the relationship, the original attorney can recover reasonable compensation up to the time the attorney was discharged. *Powers v. Rich,* 184 Pa. 325, 39 A. 62 (1898). When a client, through his or her own action, makes it impossible for the attorney to perform the contract, a quantum meruit recovery is permitted. *Thole v. Martino,* 56 Pa. Super. 371 (1914).

Pennsylvania common law recognizes both a general retaining lien and legal and equitable charging liens. The common law general retaining lien permits the attorney to retain money, papers or other property in the attorney's possession to secure payment of costs and fees not only in the particular case, but arising out of other professional business as well. *Greek Catholic Union of Russian Brotherhoods v. Russin,* 340 Pa. 295, 17 A.2d 402 (1940). The equitable charging lien gives an attorney the right to be paid out of a fund in court which resulted from the attorney's skills and labor, thereby extending only to services rendered in the particular case. *Miller v. Union Barge Line Corp.,* 299 F. Supp. 718 (W.D. Pa. 1969). The legal charging lien applies to a fund in the attorney's possession as a result of the attorney's efforts in a particular case. *Smyth v. Fidelity and Deposit Co.,* 326 Pa. 391, 192 A. 640 (1937); *Novinger v. E.I. DuPont de Nemours & Co. Inc.,* 809 F.2d 212 (3rd Cir. 1987).

As between attorney and client, the attorney is entitled to retain the file including all documents supplied by the client, as security for payment of the fee. The only exception would be where some fundamental right of the client would be impaired by recognizing the lien as where the documents are needed by the client to defend the client against criminal charges, where the client would be severely prejudiced by not having the

documents to prosecute his or her civil claim, where the client cannot prosecute or defend the client's position or obtain his or her goal without the documents or other tangible thing, where the client would suffer serious disadvantage if the documents are withheld from the client and/or where there are overriding issues of public policy. Under all other circumstances, the attorney has a right to retain papers relating to the client until either the court recognizes the lien and places a dollar amount on the lien to be paid by the client and said sum is paid or in the case of a contingent fee case, subsequent counsel agrees to protect said amount of money or the client pays the amount of the outstanding lien.

In the case at bar, the evidence did not establish a violation of Rule 1.16(a)(3) and/or 1.16(d) and therefore, the board concurs with the findings and conclusions of the Hearing Committee to dismiss these charges.

## IV. DETERMINATION

It is therefore the determination of the Disciplinary Board to dismiss these charges against both respondents.

Board members Hill, Lieber and Flaherty did not participate in the adjudication.

## ORDER

And now, January 30, 1995, upon consideration of the report and supplemental report and recommendations of Hearing Committee [    ] filed December 7, 1992 and March 9, 1993 it is hereby ordered that the charges filed against respondent [1] and respondent [2], docketed at nos. 55 D.B. 91 and 56 D.B. 91, be dismissed.